UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | : | Civil Action No. |
| MICHAEL SCOTT VOGEL, | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | **COMPLAINT** |
|  | : |  |
| TAKEONE NETWORK CORP. d/b/a | : |  |
| WRAPBOOK, PATRICK ALI JAVID, | : | **JURY TRIAL** |
| NAYSAWN NAJI, HESHAM EL-NAHHAS, | : | **DEMANDED** |
| and CAMERON WOODWARD, individually, | : |  |
| and in their capacity as Co-Founders of | : |  |
| WRAPBOOK | : |  |
| Defendants. |  |  |

Plaintiff Michael Scott Vogel, by and through its attorneys, hereby files this First Complaint against, alleges as follows:

## INTRODUCTION

1.     Plaintiff Michael Scott Vogel is an award-winning producer, with significant feature film production credits, and significant experience in television, commercial, and other forms of entertainment and media production.

2.      Vogel's extensive production experience sparked his idea to create an all-in-one computer system to manage the complexities of entertainment and media production.  Vogel named his system Tradekraft.

3.     Vogel knew there was long-felt, unmet need and a vast market for Tradekraft.

4.     Vogel is not a software programmer, however, and he sought to find a software developer to help him develop Tradekraft.

5.     In March 2017, Vogel connected with Defendant Naysawn Naji, a self-described "technical financial services leader who likes building software products that users love."  Naji had no production experience whatsoever but represented to Vogel that he had the software experience (particularly with respect to fintech startups) that Vogel needed to develop Tradekraft.

{01122810.DOCX.2}

6.     After a "Go-Or-No-Go Period," during which Naji evaluated Vogel's Tradekraft plans in confidence to decide whether he wanted to be a part of the Tradekraft venture, Naji committed to it. In exchange, Naji received an interest in Tradekraft, including a monetary interest in revenue or other proceeds from Tradekraft.

7.     Vogel partnered closely with Naji, and later with Naji and Defendant Hesham El-Nahhas to bring Tradekraft to market.

8.     Naji, El-Nahhas, and Vogel worked closely and collaboratively in New York, New York, for the better part of a year researching, developing, testing, and iterating the Tradekraft software from Vogel's plans, preparing pitch decks, conducting interviews to validate design and software features, and approaching investors.

9.     In June 2017, Naji proposed written terms for the partnership under which he and Vogel were operating under, and he updated those terms in December 2017 to add El-Nahhas to assist with that software development with Vogel's consent.

10.     But after working on Tradekraft for the better part of a year together in New York, including in New York County (with Naji and El-Nahhas residing in New York during that time) and making and progress, Naji and El-Nahhas betrayed Vogel and froze Vogel out of what became a business that is now reported to be valued at a billion dollars.

11.     In January 2018, Naji proposed to terminate the joint venture.   Naji sought dissolution terms that relegated Vogel to "senior advisor" status in a venture that was Vogel's idea in the first place and sought to have Vogel agree that Naji and El-Nahhas were unfettered to pursue Vogel's business model and Tradekraft plans and work product *without* Vogel but using Vogel's ideas and the Tradekraft work product and software code and in competition with Vogel and Tradekraft.

12.     Vogel did not agree to those ridiculously unfair, one-sided proposed dissolution

terms.

13.     Naji and El-Nahhas did not bring dissolution proceedings to dissolve the joint venture.

14.     Instead, Naji and El- Nahhas, aided and abetted by Defendant Wrapbook and its other co-founders, including Defendants Patrick Ali Javid and Cameron Woodward, knowingly and surreptitiously misappropriated the ideas and the work that was done developing Tradekraft, and brazenly used them to form Defendant Wrapbook without Vogel.

15.     Naji and El-Nahhas unilaterally "seized the venture" for themselves, used the Tradekraft work product, including on information and belief, the Tradekraft software and other work product, to develop Wrapbook,  and secure funding of over $100 million for Wrapbook (now valued at $1 billion, including from a venture capital firm that Naji had approached on behalf of Tradekraft), without compensating Vogel *or even allowing him to continue development of the Tradekraft software code on his own*, and removed Vogel's ability to access the software communication platforms where the work product that Naji, El-Nahhas, and Vogel were doing to implement Tradekraft were stored.

16.     On information and belief, Defendants began to prepare to form what became Wrapbook and use the Tradekraft ideas and work product in competition with Tradekraft prior to any termination of the Tradekraft joint venture.

17.     On information and belief Defendants Ali Javid and Cameron Woodward aided and abetted Naji and El-Nahhas in their breaches off their contractual and fiduciary obligations of Naji and Eel-Nahhas to Vogel and knowingly formed Wrapbook and developed the Wrapbook software using the work product from Tradekraft in disregard of Vogel's rights.

18.     Wrapbook's website (https://www.wrapbook.com/) describes its software as an all-in-one software suite for onboarding, production management, entertainment payroll, and

production insurance for entertainment and media production – exactly what Vogel, Naji, and El-Nahhas, working from Vogel's plans and designs, had been setting up Tradekraft to be.

19.     Wrapbook's business model today incorporates the same fundamental elements present in what Vogel shared with Naji and El-Nahhas in confidence in connection with their Tradekraft joint venture.

20.     This brazen misconduct gives rise to claims of breach of fiduciary duty, breach of joint venture agreement, breach of contract, misappropriation of business idea, misappropriation of work product, trade secrets under federal and state law, breach of the duty of good faith and fair dealing, unjust enrichment, specific performance, and constructive trust.

## PARTIES

21.     Plaintiff Michael Scott Vogel is an individual who resides at 14 Verona Street, Apt 4A, Brooklyn, NY 11231. Vogel also has also conducted business dealings through Kingdom of Id LLC.

22.     On information and belief, Defendant TakeOneNetwork Corp. d/b/a Wrapbook ("Wrapbook"), is a Delaware corporation, with a registered agent, The Corporation Trust Company, and registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 198702 at the Corporation office.

23.     On information and belief, at the time TakeOneNetwork Corp. was formed, it was incorporated by Defendant Naysawn Naji, on December 20, 2019, who stated that he resided at 109 Strathearn Avenue North, Montreal-Ouest, Quebec H4X 1X8 in the incorporation filing.

24.     On information and belief, Defendant Wrapbook maintains places of business at 228 Park Ave S #36206, New York, NY 10003, 901 King St W Toronto, Ontario M5V 3H5, Canada, and 8605 Santa Monica Blvd. West Hollywood, California. On information and belief, Wrapbook functions as a distributed corporation in which Wrapbook's officers direct, control, and coordinate

its activities remotely from multiple locations.  On information, Wrapbook does not have a true principal place of business.

25.     On information and belief, Defendant Naysawn Naji now resides at 141 Dorchester Ave, Unit 119, South Boston, Massachusetts 02127.

26.     On information and belief, Defendant Hesham El-Nahhas now resides at 100 Harbour Street, Apt 4809, Toronto, Ontario M5J 0B5 Canada.

27.     During the almost one year that Vogel worked with Naji and El-Nahhas on Tradekraft, Vogel resided in New York (in Brooklyn), and the work that they did on Tradekraft was performed in New York, including in New York County.   Naji and El-Nahhas lived in New York as well during this period.

28.     On information and belief, Defendant Cameron Woodward resides at 3246 Ettie St. # 23, Oakland, California 94608-4016.

29.     On information and belief, Defendant Patrick Ali Javid, Wrapbook's Chief Executive Officer, resides at 25522 Kingston Court, Calabasas, California 91302-3152.

## JURISDICTION AND VENUE

30.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because there is a claim arising under laws, or treaties of the United States, including a claim for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839.

31.     This Court has diversity jurisdiction pursuant to 28 U.S.C. 1332 because all parties are citizens of different states and the amount in controversy exceeds $ 75,000.

32.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims form part of the same case or controversy as his federal claims under Article III of the United States Constitution.

33.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events

or omissions giving rise to the claim occurred in this district, and the Defendants have conducted business and regularly conduct business in the County of New York.

## FACTUAL ALLEGATIONS

34.     In 2017, Vogel connected with Naji on the Shapr.com networking platform.

35.     After connecting on the Shapr.com networking platform, Vogel and Naji met in person for lunch in New York.  Vogel broadly discussed his plans for Tradekraft with Naji, and Naji agreed to keep the discussions confidential.

36.     Naji did not have any experience in media and entertainment production but represented to Vogel that he had a fintech and software background that would enable him to develop software to implement Vogel's plans for Tradekraft.

37.     After the initial lunch meeting, Naji emailed Vogel on April 3, 2017, to make sure he captured Vogel's ideas from that initial discussion correctly and understood them.

38.     Those initial ideas included creating software to manage the production process and facilitate production briefs and to create an end-to-end system that would also manage payroll and expenses and charge processing fees that were a percentage of the transaction fees to do so.  Vogel also envisioned users having a portable payroll profile.

39.     In reliance on  Naji's agreement to develop the code for a minimal viable product version of the Tradekraft software (the "MVP") in exchange for a beneficial interest in Tradekraft, including a monetary interest in revenue or other proceeds from the Tradekraft platform when it succeeded, Vogel continued to share with Naji his ideas on how Tradekraft should be built, including detailed plans for what information should be collected about productions, their schedules, budgets, personnel, and vendors, how that information should be collected and presented, and how payments should be made and funds should flow between production companies, personnel and vendors.

40.     Vogel's production experience gave him key insights into the MVP's user interface and user experience.  Vogel was the driving vision for both aspects of Tradekraft.

41.     Vogel explained to Naji in confidence his ideas to create (and *monetize*) an automated electronic version of a classic production book: a detailed, self-contained, and comprehensive specification of everything that takes place during a production that would be flexible to adapt in real time to the changes which inevitably occur during a production (which Vogel knew from personal experience).  A production book is also known to persons who participate in content production as a "Wrap Book."

42.     Vogel also explained to Naji in confidence how he envisioned pricing and monetizing Tradekraft, which was based on his experience working in entertainment production – experience which Naji (and El-Nahhas) did not have.

43.     Vogel and Naji worked closely together in collaboration, from April 2017 until January 2018, as Naji and El-Nahhas implemented Vogel's vision in the Tradekraft MVP software.

44.     During the almost one year that Vogel worked with Naji and El-Nahhas on Tradekraft, Vogel resided in New York (in Brooklyn), and the work that they did on Tradekraft was performed in New York, New York, including in New York County.   Naji and El-Nahhas lived in New York as well during this period.

45.     The information Vogel provided and collaborated on with Naji and El-Nahhas included a document they both referred to as the "Kitchen Sink document," which included plans to handle onboarding, payroll and insurance.

46.     Vogel, Naji, and El-Nahhas worked together on detailed bug lists and other documents outlining features and how they were to be implemented, as well as documents outlining weekly tasks for Naji, Vogel, and El-Nahhas to accomplish (including, for example, tech backlogs).

47.     The Tradekraft Software Code was developed in a platform called Tradekraft.io,

which had messaging capabilities.

48.    The documents that Vogel provided and collaborated on with Naji and El-Nahhas to aid Naji and El-Nahhas to develop the Tradekraft software and the Tradekraft.io Software Code and MVP itself (collectively, the "Tradekraft Work Product") were kept confidential during the time that Vogel, Naji, and El-Nahhas worked together collaboratively in the development of the Tradekraft.io Software.

49.    The Tradekraft Work Product derived independent economic value from not being generally known to or readily accessible to the public through proper means prior to its misappropriation.

50.    The Tradekraft Work Product is related to a software product intended for use in interstate and international commerce.

51.    Vogel, Naji, and El-Nahhas took reasonable steps to preserve the secrecy of the Tradekraft Work Product, including using password protection and limiting access to Tradekraft Work Product to those with a business need to know.

52.    In June 2017, Naji and Vogel laid the groundwork for a written partnership agreement when Naji provided proposed terms for their partnership.

53.    As the Tradekraft software development progressed, it became evident that Naji did not have all programming skills necessary to implement Tradekraft (including certain functional elements such as messaging, a mobile app, etc.).

54.     Naji sought to have El-Nahhas assist him and presented El-Nahhas's addition to the Tradekraft team to Vogel for approval of Vogel and Naji. Naji updated the shared Google document in December 2017.

55.    Naji has removed Vogel's ability to access shared Google documents, including those that proposed partnership terms.

56.     Vogel agreed El-Nahhas could be a partner but did not agree that El-Nahhas should be compensated from Vogel's partnership share as opposed to Naji's share.

57.     The December 2017 updated partnership terms provided equity would be "formalized upon raising funds for Tradekraft" and contemplated that in the case of an uneven contribution to Tradekraft, equity would not be split evenly.

58.     Vogel, Naji, and El-Nahhas continued to conduct market research and prepared pitch decks featuring Naji, Vogel, and El-Nahhas as the "Team" and "Partners" behind Tradekraft.

59.     Vogel, Naji, and El-Nahhas approached potential investors, including Saxon Eldridge, the Head of Production & Co-Founder of Anchor Worldwide, who was provided with a user account to test Tradekraft under a non-disclosure agreement.  Eldridge provided very positive feedback.

60.     Naji represented to Vogel that he had approached the Andreesen Horowitz venture capital firm, AH Capital Management, LLC, on behalf of Tradekraft and had received very positive feedback from Andreesen Horowitz.

61.     Naji proposed having Defendant Cameron Woodward work on Tradekraft in late 2017, in an email sent to Vogel using the tradekraft.io platform that Vogel is no longer able to access, but the email is also believed to have been sent to Woodward's gmail.com account.

62.      Vogel was open to considering Woodward's participation in Tradekraft but had never agreed to it, as Vogel did not meet Woodward in person before Naji sought to terminate the Tradekraft partnership.

63.     Woodward was not a software programmer like El-Nahhas and Naji, and planned features and functionality for Tradekraft, including plans to manage payroll and handle insurance (suggested by  Naji as  the usefulness of Woodward's background) were already defined, and the development of the MVP for Tradekraft had progressed to the point that it has been tested,

positively reviewed, and was being revised to meet professional expectations based on that feedback, even though the planned payroll feature had not yet been implemented.

64.     At the time that Naji proposed adding Woodward to the team, Woodward had not done any work on developing an all-in-one computer system to manage the complexities of entertainment and media production.

65.     On information and belief, any exposure Woodward had to the idea of developing an all-in-one computer system to manage the complexities of entertainment and media production came from Naji describing the work that Vogel, Naji, and El-Nahhas were already doing with Tradekraft, when Naji approached Woodward about joining Tradekraft.

66.     Woodward's background did not address a "need." Vogel was already providing the vision and industry-experience expertise, and Naji and El-Nahhas were providing software coding for Tradekraft.

67.     When Vogel grew concerned about the implications of Naji's request to bring Woodward into Tradekraft, he asked for access to the Tradekraft code ("the Tradekraft.io Code"), but Naji refused.

68.     Although Vogel had established the joint venture partnership with Naji and approved a joint decision adding El-Nahhas to that venture partnership, he had not reached any such agreement with Woodward's participation, or any agreement on the amount and source of El-Nahhas's equity compensation.  Any information Naji shared with El-Nahhas was subject to the confidentiality and contractual and fiduciary obligations Naji and El-Nahhas had with Vogel and Tradekraft.

69.     In January 2018, after nearly a year of close work to build Tradekraft, Naji abruptly indicated in an in-person meeting that he and El-Nahhas did not wish to continue the partnership with Vogel.

70.     On information and belief, before that conversation took place, Naji and/or El-Nahhas had already contacted Javid about working together using Tradekraft property, but without Vogel.

71.     In other words, Naji and El-Nahhas sought to terminate the partnership *after* having benefitted from Vogel's contribution of his vision and experience regarding the functional specifications for the Tradekraft user experience and interface, but (i) without Naji having delivered the MVP that was to be the contribution of Naji and El-Nahhas to the joint venture, and (ii) using the Tradekraft assets – including Mr. Vogel's contributions – to Vogel's detriment.

72.     Naji and El-Nahhas' actions betray that intent, because despite Naji having admitted that (i) he, El-Nahhas, and Vogel had in fact formed a partnership, and (ii) that the Tradekraft.io Code belonged to the partnership (and thus that Vogel had rights to that code), Naji refused to provide that code to Vogel unless Vogel agreed to the partnership dissolution terms Naji proposed.

73.     Specifically, on January 16, 2018,  Naji wrote an email to Vogel and  El-Nahhas, stating that "[w]e originally planned to start Tradekraft as partners and in doing so we developed an initial prototype, and created initial marketing material (logo, deck, etc.)" and proposed dissolving the partnership and, among other things, delivering the source code to all three parties, with all three parties having a fully paid perpetual license to the Tradekraft.io code.

74.     Vogel was not willing to agree to those ridiculously unfair and one-sided terms, and thus Naji and El-Nahhas locked Vogel out of the Tradekraft.io Code, the Slack and Balsamiq platforms, and shared Google documents, hindering and effectively preventing Vogel from moving forward with Tradekraft while they, aided and abetted by Wrapbook, Javid, and Woodward, used the Tradekraft Work Product in setting up Wrapbook on substantially the same lines as Tradekraft both prior to and after any termination of the Tradekraft joint venture.

75.     Defendants knew that their conduct was wrongful and made efforts to conceal the

future plans for the Tradekraft work product from him. El-Nahhas told Vogel that he was moving back to Canada, suggesting he was not continuing with the Tradekraft venture, and did not state he was starting a new venture in competition with Tradekraft; Naji also did not state he intended to use the Tradekraft work product to form a competing venture.

76. After Vogel learned that Naji, El-Nahhas, and Woodward co-founded Wrapbook in 2019 without him (after originally calling it "TakeOne"), and that Wrapbook secured $3.6 million in seed funding in August 2020, Vogel began to realize how Messrs. Naji and El-Nahhas betrayed him by misappropriating the Tradekraft work product and brazenly using it to form and develop Wrapbook.

77. Wrapbook includes features and functionalities that were plainly based on Tradekraft.io Code and Tradekraft Work Product, including onboarding, organization, processing, storage, and reporting of project, crew, and vendor payroll, expense, and tax information and payments in a manner which Vogel conceived and designed with his extensive production experience to be attractive to, and user-friendly for, the production industry.[1]

78. Indeed, in an In March 2021 in interview in Alleywatch,[2] Defendant Javid (Wrapbook's CEO) described the Wrapbook business model in the same basic terms that Naji has admitted were Vogel's own original ideas – the business idea, the functionalities, and the market need – that formed the animating purpose of their joint venture beginning in April 2017.

79. In the Alleywatch interview, Javid stated in response to the question: "Tell us about the product or service that Wrapbook offers" that "Wrapbook is a vertical fintech platform for

---

[1] These features and functionalities are described at: https://www.wrapbook.com/features/onboarding; https://www.wrapbook.com/features/payroll; https://www.wrapbook.com/features/management; and https://www.wrapbook.com/features/insurance.

[2] https://www.alleywatch.com/2021/03/wrapbook-payroll-fintech-platform-entertainment-industry-project-workers-ali-javid/

employers to onboard, pay, and insure project workforces. Employees then have a profile portable between employers."

80.     Javid described the business model as: "We provide easy-to-use software to process payroll, charge processing fees for doing so, and sell general liability insurance." This is the same business model that Vogel described to Naji in April 2017; the documents showing the Tradekraft joint venture's work explicitly demonstrate that adding on insurance was part of the planned functionality of the Tradekraft product.

81.     Naji and El-Nahhas incorporated other Tradekraft Work Product into Wrapbook that reflected in documents and communications that Vogel, Naji, and El-Nahhas maintained in confidence during the period of the better part of a year that they worked together on Tradekraft.

82.     In violation of the contractual and fiduciary obligations they owed to Vogel, Naji and El-Nahhas used Tradekraft Work Product in forming Wrapbook and developing Wrapbook's software.

83.     Naji, El-Nahhas, Woodward, and Wrapbook improperly (i) locked Vogel out of the Tradekraft.io code, denying Vogel and Tradekraft the first mover advantage in the industry and hindering and effectively preventing Vogel's ability to move forward with Tradekraft; (ii) used the Tradekraft Work Product to form Wrapbook without him, and (iii) secured funding for it in competition with Tradekraft (including from venture capital firms Naji had originally approached *on behalf of Tradekraft* during his partnership with Vogel).

84.     That funding has now exceeded $100 million, and Wrapbook has announced an equity valuation of approximately $1 billion.[3]

---

[3] https://deadline.com/2022/04/wrapbook-payments-hollywood-production-mobile-app-100-million-funding-1234992499/; https://www.bloomberg.com/news/articles/2021-11-10/tiger-global-bets-on-wrapbook-vaulting-it-to-unicorn-status

## FIRST CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1839
## AND COMMON LAW
## (Against all Defendants)

85.     Plaintiff repeats realleges each of the allegations in paragraphs 1 through 84 as though set forth fully herein.

86.     By virtue of the foregoing, Defendants have violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. (the "DTSA") by misappropriating trade secrets of Vogel and the Tradekraft joint venture related to services used in, or intended for use in, interstate or foreign commerce and intended to be used in, conducting business throughout the United States, including the Tradekraft Work Product, without authorization, in the formation of Wrapbook and development of the Wrapbook software.

87.     Plaintiff has been damaged from Defendants' misappropriation in an amount to be determined at trial, including compensatory damages, exemplary damages, and reasonable attorneys' fees, costs, and pre- and post-judgment interest.

## SECOND CAUSE OF ACTION
## (Breach of Actual or Implied Contract)
## Against All Defendants

88.     Plaintiff repeats realleges each of the allegations in paragraphs 1 through 87 as though set forth fully herein.

89.     By virtue of the foregoing, there existed an actual or implied contract, pre-incorporation promoters' contract, and/or a joint venture agreement, between Vogel, Naji and El-Nahhas, pursuant to which they had agreed to contribute their personal services toward the development, organization, and promotion of a company to develop Tradekraft, an all-in-one computer system to manage the complexities of entertainment and media production.

90.     After the Go-Or-No-Go Period where Naji assessed the viability of Vogel's

Tradekraft ideas in confidence, Naji and Vogel demonstrated their mutual assent by collaborating to develop Tradekraft software and obtain funding for Tradekraft.

91.    Naji, Vogel, and El-Nahhas demonstrated their mutual assent to El-Nahhas joining the agreement subject to the same confidentiality agreement as Naji and Vogel by their collaborating with El-Nahhas to develop Tradekraft software and obtain funding for Tradekraft for the better part of a year.

92.    Implicit in the agreement between Vogel, Naji, and El-Nahhas, were the terms that each of them would be partners or founders of the venture and that equity and liability in the venture would be shared between them, with the precise share of each co-venturer's respective equity and liability to be determined in the future by mutual agreement.

93.    The partnership agreement between Vogel, Naji and El-Nahhas is further evidenced by the proposed dissolution terms Naji provided to El-Nahhas and Vogel.

94.    Vogel substantially performed his obligations under the agreement.

95.    Naji and El-Nahhas breached that agreement by (i) locking Vogel out of all Tradekraft work product, including the Tradekraft.io Code, and (ii) using Tradekraft work product without Vogel to form and develop software for what became Wrapbook.

96.    This breach deprived him of the use of his novel idea to create Tradekraft, an all-in-one computer system to manage the complexities of entertainment and media production; by dissolving Tradekraft and then wrongfully using its assets to create a competing business without Vogel, Naji and El-Nahhas it also deprived him of equity and a say in the direction of the venture he initially conceived and co-founded.

97.    The conduct of Naji and El-Nahhas has damaged Vogel in an amount to be determined at trial which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Wrapbook which was derived

from the wrongdoing of Naji and El-Nahhas, lost the value of the novel Wrapbook Work Product and business plans, the deprivation of the use of the novel Wrapbook business plans and work product, and the unconscionable deprivation of Vogel's rightful ownership interest in Wrapbook.

98.     Vogel is entitled to specific performance of the contract to the extent that it provided for an equity position in the company since money damages are not an adequate remedy to compensate for the deprivation of what should have been Vogel's equity interest in Wrapbook.

99.     By virtue of the foregoing, Wrapbook and the other Defendants inherit the contract liability by virtue of their adoption, ratification, and acquiescence to the terms of the joint venture agreement between and among Naji, El-Nahhas and Vogel.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)
### Against Defendants Naji and El-Nahhas

100.     Plaintiff repeats realleges each of the allegations in paragraphs 1 through 99 as though set forth fully herein.

101.     By virtue of their joint venture agreement, Defendants Naji and El-Nahhas owed formal fiduciary duties to Vogel.

102.     Defendants Naji and El-Nahhas knowingly breached those duties to Vogel prior to any termination of the Tradekraft venture.

103.     These breaches of duty have damaged Vogel in an amount to be determined at trial, which damages include but are not limited to lost profits, lost business opportunities.

104.     By virtue of the foregoing, Vogel is entitled to punitive damages.

105.     By virtue of the foregoing, Vogel is also entitled to equitable remedies, including a constructive trust over Wrapbook's common stock, and a complete accounting from all Defendants for the profits of which Vogel has been wrongfully deprived.

## FOURTH CAUSE OF ACTION
### (Misappropriation of Business Idea)
### Against All Defendants

106.    Plaintiff repeats realleges each of the allegations in paragraphs 1 through 106 as though set forth fully herein.

107.    Vogel's Tradekraft business concept, model, and plans and the Tradekraft Work Product were novel and unique.

108.    Naji himself recognized Vogel's Tradekraft ideas and work product as novel and unique, and valuable, as reflected in his decision to commit to the Tradekraft venture after reviewing those ideas and work product in confidence during the Go-Or-No-Go-Period.

109.    Vogel, Naji and El-Nahhas had an agreement to form a joint venture together, the business purpose of which would be the creation of what became the Tradekraft Work Product, which was based upon Vogel's unique ideas including business concepts, models, and plans which were disclosed to Naji, and later to El-Nahhas, in confidence and in reliance upon their agreement.

110.    That agreement included an obligation to keep the Tradekraft Work Product, and all of Vogel's ideas forming the basis thereof, confidential.  The agreement also obligated Vogel, Naji, and El-Nahhas to pursue opportunities for the Tradekraft Work Product on behalf of the joint venture, and for the benefit of the joint venture, and not to the exclusion of the joint venture or any members thereof.

111.    Naji and El-Nahhas have acted in bad faith by freezing Vogel out in forming Wrapbook based upon the Tradekraft Work Product, but without him and hindering and effectively preventing Vogel's ability to move forward with and raise capital for Tradekraft.

112.    Defendants used the Tradekraft Work Product (including Vogel's unique and novel ideas incorporated therein, as well as the Tradekraft.io Code) in forming Wrapbook and variations thereof.

113.    By virtue of the foregoing, Defendants have wrongfully misappropriated Vogel's Tradekraft business concept and variations thereof.

114.    As a result, Vogel has been deprived of the use of his novel Tradekraft business concept and variations thereof for business opportunities and any future profits therefrom.

115.    Vogel has been damaged in an amount to be determined at trial.

### FIFTTH CAUSE OF ACTION
### (Breach of Actual or Implied Covenant of Good Faith and Fair Dealing) Against Defendants Naji and El-Nahhas

116.    Plaintiff repeats realleges each of the allegations in paragraphs 1 through 116 as though set forth fully herein.

117.    The conduct described herein of Naji, and El-Nahhas toward Vogel constitutes a breach of the covenant of good faith and fair dealing implicit in their agreement with Vogel.

118.    Their performance of the joint venture agreement was rendered in such a way as to fundamentally destroy the fruit of the bargain for Vogel.

119.    Wrapbook and the other Defendants inherit liability flowing from the breach of the covenant of good faith and fair dealing of Naji and El-Nahhas by virtue of its adoption at incorporation, ratification, and acquiescence to the contract of Naji and El-Nahhas with Vogel.

120.    Defendants Naji and El-Nahhas also breached their duties to wind down the Tradekraft venture in good faith after any termination of that venture.

121.    Vogel has been damaged by the breaches of Naji and El-Nahhas in an amount to be determined at trial, which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Wrapbook which was derived from the wrongdoing of Naji and El-Nahhas, lost executive salary, the value of the novel Wrapbook business idea and work product, the deprivation of the use of the Wrapbook business idea and work product, and the unconscionable deprivation of Vogel's rightful ownership interest in Wrapbook.

122.    Vogel is entitled to specific performance of the contract to the extent that it provided for an equity position since money damages are not an adequate remedy to compensate for the deprivation of Vogel's equity interest in Wrapbook.

123.    By virtue of the foregoing, Vogel is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**Against All Defendants**

124.    Plaintiff repeats realleges each of the allegations in paragraphs 1 through 123 as though set forth fully herein.

125.    By virtue of the foregoing, all Defendants have unconscionably benefitted at the expense of Vogel by keeping and using for themselves the interest in Wrapbook to which Vogel is entitled.

126.    Vogel has been unconscionably deprived of his interest in Wrapbook.

127.    Defendants have been unjustly enriched at Vogel's expense because Defendants have appropriated Vogel's interest in Wrapbook for themselves and are now marketing and developing what was Vogel's novel, original and unique ideas for profit, which ideas only came into contact with Defendants *because of* Vogel's participation in the joint venture with Naji and El-Nahhas, yet Defendants purposefully acted in a way so as to deny Vogel any compensation for the use of his novel, original, and unique ideas which undergird Wrapbook's product.

128.    Additionally, based on Naji and El-Nahhas' wrongful lock-out of Vogel from the Tradekraft.io Code, Vogel has been deprived of the ability to market what once was, but no longer is, a novel, original, and unique business idea.

129.    Accordingly, it is against equity and good conscience that Defendants be permitted to reap the rewards of Vogel's unique ideas while depriving Vogel of his apportionment of the shares, profits, and other compensation that he would otherwise have received.

### SEVENTH CAUSE OF ACTION
### (Unfair Competition)
### Against All Defendants

130.     Plaintiff repeats realleges each of the allegations in paragraphs 1 through 129 as though set forth fully herein.

131.     By virtue of the foregoing conduct, Defendants have misappropriated Vogel's Tradekraft business model, insight, skills, and work product through bad faith, deception, and abuse of a fiduciary relationship.

132.     Vogel is entitled to compensatory damages in an amount to be determined at trial.

133.     By virtue of the foregoing, Vogel is entitled to punitive damages.

### EIGHTH CAUSE OF ACTION
### (Promissory Estoppel)
### Against Defendants Naji and El-Nahhas

134.     Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 133 as though fully set forth herein.

135.     Vogel divulged his Tradekraft business concept, and variations of it, to Naji and El-Nahhas in strict confidence and in reliance upon Naji and El-Nahhas committing to the Tradekraft joint venture.  Vogel, Naji, and El-Nahhas then developed Tradekraft collaboratively for nearly a year.

136.     Vogel reasonably and foreseeably relied to his detriment on the commitment of Naji and El-Nahhas and they knew he would and did reasonably and foreseeably rely on it.

137.     Naji and El-Nahhas acted in bad faith by (i) freezing Vogel out of the Tradekraft joint venture which later became Wrapbook; (ii) engaging in self-dealing by wrongfully misappropriating Vogel's concept for themselves and others; (iii) refusing to acknowledge Vogel as a co-founder of Wrapbook; (iv) depriving  of his rightful interest in Wrapbook; and (v) failing to

disclose to Wrapbook's shareholders, partners, and investors that the concept for Wrapbook was originally Vogel's, that Naji and El-Nahhas developed it as part of a joint venture, and that Vogel is a rightful shareholder of Wrapbook in equity.

138.   As a result, Vogel has been unconscionably deprived of his interest in Wrapbook, and the attendant business opportunities and profits.

139.   The conduct of Naji and El-Nahhas can be imputed to all Defendants since the other individual Defendants acted in his capacity as officer, director, founder or shareholder of Wrapbook, and because Wrapbook has derived a significant market advantage by virtue of their wrongdoing.

140.   Vogel has been damaged in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty)
### Against Javid, Woodward, and Wrapbook

141.   Plaintiff repeats realleges each of the allegations in paragraphs 1 through 140 as though set forth fully herein.

142.   Wrapbook, Javid, and Woodward knew or should have known of the contractual and fiduciary relationship between Vogel, Naji, and El-Nahhas in working together on the Tradekraft venture.

143.   Wrapbook, Javid, and Woodward participated in the breaches of fiduciary duties to Vogel by developing Wrapbook with Naji and El-Nahhas without regard for Vogel's interest in the venture.

144.   Wrapbook, Javid, and Woodward then attempted to distance themselves from Vogel by crafting false origin stories for the company that omitted the role of Vogel and the use of the Tradekraft Work Product.

145.   The conduct of Wrapbook, Javid, and Woodward constitutes aiding and abetting

breaches of fiduciary duties of Naji and El-Nahhas to Vogel.

146. The conduct of Javid and Woodward is imputed to Wrapbook, and Wrapbook is vicariously liable for that conduct.

147. Vogel has been damaged by the various breaches of fiduciary duties by Naji and El-Nahhas that Wrapbook, Javid, and Woodward induced or participated in, in an amount to be determined at trial, which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Wrapbook which was derived from the wrongdoing of Wrapbook, Javid, and Woodward, and the unconscionable deprivation of her his rightful ownership interest in Wrapbook.

148. By virtue of the foregoing, Vogel is entitled to an award of punitive damages against Wrapbook, Javid, and Woodward.

149. By virtue of the foregoing, Vogel is also entitled to equitable remedies, including a constructive trust and a complete accounting from Wrapbook of his rightful interest in Wrapbook.

### TENTH CAUSE OF ACTION
### (Usurpation of Joint Venture Opportunity)
### Against All Defendants

150. Plaintiff repeats realleges each of the allegations in paragraphs 1 through 149 as though set forth fully herein.

151. By virtue of the foregoing conduct, Defendants took funding opportunities for Wrapbook that should been Tradekraft's, including Andreesen Horowitz, which Mr. Naji first approached on behalf of Tradekraft, but which later funded Wrapbook.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Scott Vogel respectfully requests that the Court enter judgment:

A. awarding Plaintiff Michael Scott Vogel direct, compensatory, and consequential

damages in an amount to be determined at trial, to compensate Plaintiff for the losses it suffered by reason of Defendants' breaches of contract and fiduciary duty (and the aiding and abetting of those breaches) and usurpation of joint venture opportunity, together with punitive damages, declaring Plaintiff Vogel to be a founder of Wrapbook, awarding a constructive trust, and directing that Defendants provide a complete accounting to Vogel of his rightful interest in interest in Wrapbook;

B.      awarding Plaintiff compensatory damages, exemplary damages, reasonable attorneys' fees, and costs available under the DTSA and common law from Defendants' misappropriation of trade secrets;

C.      awarding Plaintiff damages, including actual damages, disgorgement of ill-gotten gains and unjust enrichment, exemplary damages, and costs and attorneys' fees; and

D.      granting Plaintiff such other and further relief as the Court deems just and proper.

Date:   May 16, 2022
        New York, New York

                        Respectfully submitted,

                        _____
                        John C. Stellabotte, Esq.
                        James M. Smedley, Esq.
                        John B. Horgan, Esq.
                        Joanna R. Cohen, Esq.
                        ELLENOFF GROSSMAN & SCHOLE LLP
                        *Attorneys for Plaintiff*
                        1345 Avenue of the Americas, 11th Floor
                        New York, New York 10105-0302
                        P: (212) 370-1300