UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL SCOTT VOGEL, individually and on behalf of the Tradekraft Partnership,<br><br>                       Plaintiff,<br><br>        -against-<br><br>TAKEONE NETWORK CORP. d/b/a WRAP-BOOK; NAYSAWN NAJI; HESHAM EL-NAHHAS; CAMERON WOODWARD; PAT-RICK ALI JAVID, individually and in their capacity as Cofounders of WRAPBOOK,<br><br>                       Defendants. | 22-cv-3991 (AS)<br><br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

    Plaintiff Michael Scott Vogel worked with defendant Naysawn Naji on developing a software prototype in 2017. After the collaboration went south, Naji told Vogel he wanted to work on a different project with other people. Naji's new venture became Wrapbook, which in 2021 secured a $1 billion valuation. Vogel sued. He alleges Wrapbook is the product that Naji contracted to build with Vogel, and that Naji and his cofounders misappropriated Vogel's trade secrets and business ideas. Defendants moved for summary judgment and to exclude Vogel's damages expert. Vogel moved to exclude defendants' rebuttal expert. For the following reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion to exclude Vogel's damages expert is GRANTED. Vogel's motion to exclude defendants' rebuttal damages expert is DENIED as moot, and his motion for an adverse inference based on spoliation is DENIED.

## BACKGROUND

    Vogel is a "creative director, executive producer, and producer with over twenty years' experience in feature films, television advertising, and other forms of entertainment and media production." Dkt. 62 ¶ 5. In 2017, Vogel connected with Naji, a software engineer, on an app for aspiring entrepreneurs called Shapr. Dkt. 155 ¶¶ 1, 23. In April of that year, Vogel and Naji met for lunch, where Vogel "told Naji about his experience as a producer in the [entertainment] industry" and "discussed ideas for potential software for producers." *Id.* ¶¶ 26–27.

    After the meeting, Naji sent Vogel an email with "the notes that [he] jotted down about the ideas that [they] discussed." Dkt. 120-13 at 3. The email listed "[Vogel's] 2 Ideas" as "1. Software to manage/facilitate production briefs" and "2. Payroll/expense management for gig based jobs." *Id.* On this second idea, Naji summarized the problem as being that "[a]s a contractor, for each gig

that you have, it's pretty painful to get set up just to get paid. Lots of paperwork and it's all offline." *Id.* The solution Vogel proposed was to "[c]reate an end to end system to handle payroll and expenses between you and the company paying you. Like gusto, [a payroll company,] you set up your payment information + then for each gig, you just hand them your payroll profile, authorize giving [sic] them paying you + they authorize your spending limits + you're done." *Id.* at 4. The idea was that "[t]hen the production company hires the payroll company, not the contractors themselves." *Id.* Vogel responded to Naji's summary of this idea, explaining that he "wouldn't consider this a payroll company[, he] would consider it a new studio system." *Id.*

Naji then created a shared Google Document, which he and Vogel sometimes referred to as the "kitchen sink" document, for brainstorming software-solution ideas for the entertainment industry. Dkt. 155 ¶¶ 33–34. The kitchen sink document contains multiple ideas for a minimum viable product (MVP), including "[a] web based system for information collection and payment for everyone involved in a production," which would "[h]andle flow of funds" and "payroll." Dkt. 120-15 at 2. The second MVP idea was "LinkedIn for Production," which would allow the user to "collect information from each person involved in the production" and "[c]reate a 'Production Book' (which is a detailed spec of everything that will happen on a shoot)." *Id.* at 3–4. Vogel and Naji used the name "Tradecraft" to refer to their proposed solution and described it as the "Google meets Linkedin meets Basecamp meets [sic] for the Entertainment and Media Professional." *Id.* at 10.

After a few months of brainstorming, Naji and Vogel "decided to develop a software prototype to build digital production books." Dkt. 155 ¶ 97. Naji's longtime friend, Hesham El-Nahhas, another software engineer, helped to code the prototype, *id.* ¶¶ 6, 9, 98, which Naji, Vogel, and El-Nahhas referred to as "Tradekraft," *id.* ¶ 100. Over the course of 2017, the parties developed a "rudimentary prototype" and shared it with multiple people to get feedback, but there was "little, if any, market interest shown in the" product. *Id.* ¶ 102. One customer who Naji showed the prototype to "slammed his hand on the table and said, 'This sucks.'" Dkt. 120-1 at 68:16–20. The prototype's "only functionalities were the creation of a digital production book and limited messaging abilities"; it "never had any payment or payroll functionalities." Dkt. 155 ¶¶ 103, 105. (Vogel claims that the parties also "had begun work on payroll, expense management, and other financial features." *Id.* ¶ 105.)

According to Naji, tensions arose between him and Vogel over the course of 2017, as Naji felt that Vogel was not meaningfully contributing to the collaboration, "nor was he identifying investors or customers for the production book prototype." *Id.* ¶¶ 136–37. On December 5, 2017, Naji emailed Vogel, explaining that "[r]ecently, it has felt to [El-Nahhas] and I that things have gone south in our work relationship with you." Dkt. 122-9. Naji proposed meeting to "discuss how to best restructure a role for" Vogel. *Id.*

Vogel says that by this date, "Naji had already cut off [Vogel's] access to partnership property" and had been communicating with other collaborators. *See* Dkt. 155 ¶ 140. Specifically, Vogel says that by October 2017, Naji was working with another longtime friend, Ali Javid. *See id.* ¶¶ 10–11, 172.

The precise date when Naji and Javid began working together is disputed. Naji says that he and Javid began brainstorming potential startup ideas "[b]eginning in late November 2017 or early December," while Vogel points to Javid's testimony suggesting that their collaboration began in October 2017. *Id.* ¶ 172; *see also* Dkt. 120-5 at 23:3–6. Defendants say that Naji and Javid "performed diligence on various ideas to try to identify a 'hair on fire' problem in the entertainment industry that could be solved with a SaaS-based software solution." Dkt. 155 ¶ 174. Vogel responds that Javid and Naji "raided confidential Tradekraft partnership property in an effort to identify a business plan to compete with or usurp the partnership." *Id.*

In any event, it is undisputed that Naji and Javid "conducted market research on the production book software prototype" that Naji had developed with Vogel. *Id.* ¶ 175. Defendants say that this market research did not reveal a demand for the production-book software, but "did reveal market demand for a . . . product that could address problems with entertainment payroll." *Id.* ¶¶ 178–79. Javid says that he told Naji in late December 2017 "that the only way [he] could work with him is if [they] focused on entertainment payroll," Dkt. 120-5 ¶¶ 52:21–53:4; by the end of December 2017, Naji and Javid decided to build an entertainment-payroll company. Dkt. 155 ¶ 183.

Around December 19, 2017, Vogel and Naji met for coffee. *Id.* ¶ 187. Naji says he told Vogel at this meeting that he was "interested in pursuing a payroll product" because "that's where the interest was." *Id.* ¶ 187. He also asked Vogel whether he would be interested in being an advisor for that product. *Id.* About a month later, Vogel and Naji spoke on the phone, during which Vogel expressed reservations about taking on an advisory role. *Id.* ¶ 188; Dkt. 122-7. Vogel told Naji that he wanted to continue doing what they were doing but acknowledged that he couldn't force Naji to work with him. *See* Dkt. 122-7 at 4, 9. He stated that he did not believe a payroll service company was the place "to start." *Id.* at 10.

Both parties agree that any partnership between the parties was dissolved at the latest by January 16, 2018, the date of this phone call. *See* Dkt. 155 ¶ 196. The next day, Vogel reached out to a friend, Jason Greenblatt, explaining that he needed "a coder [he could] trust" and "that he and Greenblatt would be in a very good position to 'move forward' on Tradekraft, an all-in-one software product for the entertainment industry." *Id.* ¶ 197. He also reached out to a potential investor. *Id.* ¶ 199. Vogel was not successful in raising money for this product and did not produce any code. *See id.* ¶ 208.

Meanwhile, in February 2018, Naji incorporated TakeOne, which was renamed Wrapbook. *Id.* ¶ 212, 213. Naji, El-Nahhas, and Javid were its cofounders. *Id.* ¶ 213. Defendants say that when it was incorporated, they intended Wrapbook to be a payroll company, but it has since "evolved to include features meant to facilitate payroll processing and increase the number of payroll clients, including onboarding, compliance, and insurance features." *Id.* ¶¶ 214–15. Cameron Woodward was hired as a cofounder in 2019 "to build out Wrapbook's insurance agency." *Id.* ¶ 240. According to defendants, Wrapbook has raised approximately $150 million across several financing rounds since September 2020. Dkt. 147-7 ¶ 24.

In May 2022, Vogel sued TakeOne (Wrapbook), Naji, El-Nahhas, Woodward, and Javid, bringing claims for "breach of partnership or contract" and breach of the covenant of good faith and fair dealing against Naji, El-Nahhas, and Wrapbook (Counts 1–2, 5), claims for an accounting, breach of fiduciary duty, and misappropriation of a business idea against Naji, El-Nahhas, and Wrapbook on behalf of Vogel individually and on behalf of the Tradekraft partnership (Count 3–4, 8), and claims for federal and state trade-secret misappropriation, unjust enrichment, and unfair competition against all defendants, again on behalf of Vogel and Tradekraft (Counts 6–7, 9–10). Vogel also brought a claim for aiding and abetting a breach of fiduciary duty against Wrapbook, Javid, and Woodward on his behalf and for Tradekraft (Count 11). Dkt. 62 ¶¶ 113–193. At the pleadings stage, the Court dismissed Vogel's claims for an accounting and Vogel's New York trade-secrets claim predicated on his product idea, as well as Vogel's claims against Wrapbook for breach of a partnership agreement, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. *Vogel v. TakeOne Network Corp.*, 2024 WL 870442, at *8 (S.D.N.Y. Feb. 29, 2024). Defendants move for summary judgment on the remaining claims.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## DISCUSSION

### I.    Trade-secret misappropriation

Defendants argue that they are entitled to summary judgment on Vogel's trade-secret misappropriation claims because (1) Vogel hasn't defined the alleged trade secrets with specificity, (2) the trade secrets he points to were publicly available in 2017, and (3) they weren't used in developing Wrapbook.

### A.    Specificity

Under the DTSA, "a claimant bears the burden of identifying a purported trade secret with sufficient specificity." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800 (2d Cir. 2023). The purpose of the specificity requirement is to "place a defendant on notice of the bases for the claim being made against it" and to "allow[] a factfinder to determine whether certain information is, in fact, a trade secret." *Id.* at 801 (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2023)). The Second Circuit has declined to articulate "a general specificity rule," holding that "[t]he existence of a trade secret, including whether it was adequately

identified, is a 'fact-specific question to be decided on a case-by-case basis.'" *Id.* (quoting *Oakwood Lab'ys*, 999 F.3d at 906).

Defendants argue that Vogel has failed to identify with sufficient specificity his trade secrets because he has not explained "the method of making [his ideas] work." Dkt. 127 at 13 (quoting *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 50 (2d Cir. 2018) (affirming grant of summary judgment under New York law)).

But as Vogel points out, this is not required under the DTSA, which defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as (i) the owner "has taken reasonable measures to keep such information secret" and (ii) "the information derives independent economic value, actual or potential, from" its secrecy. 18 U.S.C. § 1839(3). Defendants' argument is based on cases interpreting New York law. And although in many states the DTSA and state law are functionally equivalent, New York has not adopted the Uniform Trade Secrets Act (UTSA), *see Scienton Techs., Inc. v. Comp. Assocs. Int'l Inc.*, 2013 WL 1856653, at *5 (E.D.N.Y. May 1, 2013), so the same isn't true here. Ideas are protectible trade secrets under the DTSA (or a state law based on the UTSA), regardless of whether the plaintiff explains how those ideas would "work." *See Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1044 (S.D. Cal. 2017) ("Teknor's argument that YRD does not allege it knew how to manufacture or otherwise achieve its alleged concept for a new compact hose is unavailing . . . . Concepts have value independent of the product they eventually inspire."); *Fujikura Composite Am., Inc. v. Dee*, 2024 WL 3261214, at *8 (S.D. Cal. June 28, 2024) ("[I]deas are protectable as trade secrets." (citation omitted)).

Defendants also argue that "it is unclear to this day what [Vogel] claims his trade secrets are." Dkt. 127 at 14. In response, Vogel defines his (really Tradekraft's) "asserted trade secrets" as software that

> (1) provides 'gig' workers in the entertainment industry portable profiles that can be used in connection with all productions and production companies, creating network effects and the ability for the software itself to effectively and efficiently serve as an employer of record, and (2) providing access to a range of related human resources features—including payroll, onboarding, insurance, workers' compensation, tax and compliance, union calculations, and budgeting—to entertainment producers and gig workers in a single, streamlined platform. Dkt. 153 at 1.

So while Vogel previously asserted a host of alleged trade secrets, including Tradekraft's source code, now there are just two—a "portable profile" for contractors' payroll needs and a "platform" or "dashboard" for HR features. Defendants argue that these secrets are still insufficiently specific and urge this Court to reject Vogel's "attempt to reinvent his case," arguing that these alleged trade secret ideas are "divorced from the SAC in all but name and are not recognizable in documentation of how [Vogel] described profile or dashboard concepts to Naji in 2017." Dkt. 179 at 2–3.

The Court declines this invitation. To be sure, Vogel's definition of his asserted trade secrets has shifted throughout this litigation, and his deposition testimony is not a model of clarity, but the definition he proffers now is not so far off from the SAC, which defines Vogel's alleged trade secrets to "include a system for portable profiles for onboarding, payroll, and expenses, and supply chain system dashboards merging a broad range of production management tools." Dkt. 62 ¶ 149. "The existence, *vel non*, of a trade secret usually is treated as a question of fact,' and properly the province of the jury." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (quoting *Chevron, U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987)). Here, Vogel has done more than offer "nebulous descriptions at the highest level of generality," *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 673 (S.D.N.Y. 2022) (quoting *TRB Acquisitions LLC v. Yedid*, 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021)), so summary judgment on specificity grounds is unwarranted.

### B. Secrecy

Although the existence of a trade secret is usually a fact issue for the jury, summary judgment is appropriate "where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known." *Better Holdco, Inc.*, 666 F. Supp. 3d at 384 (quoting *Catalyst Advisors, L.P.*, 602 F. Supp. 3d at 672). Here, Vogel focuses on the portable-profile feature, and except for simply asserting that the HR dashboard was unique, he doesn't explain how exactly, or point to any evidence that it was an unknown or not-readily-ascertainable concept in 2017. *See* Dkt. 153 at 11–18. So summary judgment as to that alleged trade secret is granted. As for the portable profile, defendants argue that they are entitled to summary judgment because the idea of a "portable profile" was "ubiquitous in 2017." Dkt. 127 at 17.

They point to evidence that multiple competitors in the entertainment-payroll industry, such as Time is Money (TiM) and GreenSlate, employed reusable profiles. *See* Dkt. 127 at 18. For example, Wrapbook's former Director of Business Development, Mike Dearborn, who helped develop TiM, explained that TiM "worked as follows":

> First, a production administrator could set[]up startwork packet templates with pre-existing forms that crew would need to fill out to get onboarded onto the production's payroll. Next, the production administrator could send invites to crew members through TiM to invite them to fill out those startwork packets. Once crew members received their invite, they could then log-in to TiM and fill out all of their information into a profile, which then auto-populated the startwork. After that, the production administrator received the startwork digitally and could also track the status of any outstanding startwork. Most significantly, the crew profiles were reusable, once a crew member created their TiM profile, their information would be stored and re-used to autofill startwork for any subsequent production. In

this sense, the profiles for the users and the information uploaded was portable across productions and employers. Dkt. 123-23 ¶ 7.[1]

The promotional materials for TiM's Kickstarter campaign provided that TiM "allows you to create an Electronic Profile that only you can access or modify," and "[u]sing a proprietary process, TiM converts[,] scans or [sic] digital versions of startwork into a file that your Electronic Profile 'talks' to, eliminating the need for physical startwork packets." Dkt. 137-15 at 2.[2] As for Greenslate, defendants point to an article explaining that it allowed crew members to fill out startwork paperwork once and then use it on multiple projects, provided that "those projects are all going through Greenslate." Dkt. 137-13 at 5. Defendants also point to "Start+", a product offered by Cast + Crew, which offered digitized onboarding where crew members could purportedly "easily manage their own profiles by updating addresses, W-4s, and other personal information." Dkt. 137-20 at 4. And another company, CAPS Payroll, which was eventually acquired by Cast + Crew, had a product called ETC, "which sought to digitize th[e] onboarding process." Dkt. 123-24 ¶¶ 1, 6. With ETC, "[o]nce an employee filled out startwork using ETC for a specific production company, if they were later rehired to another production by the same production company, they could reuse their startwork and not reenter the same information (unless the information needed to be updated." *Id.* ¶ 6.

Vogel responds that there's a material dispute about whether these entertainment-payroll companies employed portable profiles in the manner purportedly envisioned by Vogel, shared with Naji, and eventually implemented by Wrapbook. Vogel points to Wrapbook's Series A investment memo, in which Wrapbook stated it is "the only 1:n payroll platform between employees and employers that's more akin to PayPal than traditional payroll." Dkt. 161-7 at 4. Vogel also points to Naji's testimony, where he differentiated between Wrapbook and other entertainment-payroll companies. He described GreenSlate as largely "a paper-based method where you actually had to email everything in and have things scanned in," and TiM as "an on-boarding solution for existing entertainment payroll companies to provide a recurring way to onboard and submit information digitally, primarily about filling out forms for other payroll companies." Dkt. 120-1 at 262.

Defendants argue that this evidence does not create a genuine dispute because "Naji's recollection of companies' features in 2017 cannot dispute objective evidence of the publicly available functions in 2017," "[n]or can [Vogel] define his trade secret based on Wrapbook's products." Dkt. 179 at 6. But Vogel has introduced some evidence that his ideas were unique from the portable

---

[1] Vogel argues that this testimony is inadmissible because Dearborn is an undisclosed expert. The Court disagrees. Dearborn is testifying as a fact witness, and he was disclosed as such in defendants' initial disclosures. *See* Dkt. 179 at 6.

[2] Vogel objects that this evidence is inadmissible because it's hearsay or, in the alternative, that the webpages are unauthenticated. These webpages have been sufficiently authenticated or could be at trial. Dkt. 179 at 5. As to the hearsay objection, the Court doesn't rely on these webpages for the truth of the matter asserted, but rather to understand what was communicated publicly when Vogel shared his ideas with Naji. Because of the nature of Vogel's alleged trade secrets—which was an idea without software or a functioning prototype—the public communication of those ideas is what's important.

profiles that were on the market, and "where both parties have proffered evidence as to whether an alleged trade secret is well-known in the industry, a genuine issue of fact exists and summary judgment for either party is not warranted." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021). For these reasons, Vogel's trade-secret claim, to the extent premised on the portable-profile feature, may proceed to trial.

## II.    Business-idea misappropriation

Defendants also move for summary judgment on Vogel's claim for misappropriation of a business idea. "To succeed on such a claim under New York law, a party must prove (1) the existence of a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact contract, or quasi-contract; and (2) the idea must be novel and concrete." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *20 (S.D.N.Y. Feb. 20, 2008). Defendants argue that they are entitled to summary judgment on this count because Vogel has failed to allege a sufficiently novel and concrete business idea.

> "The determination of whether an idea is original or novel depends upon several factors, including, *inter alia,* the idea's specificity or generality (is it a generic concept or one of specific application?), its commonality (how many people know of this idea?), its uniqueness (how different is this idea from generally known ideas?), and its commercial availability (how widespread is the idea's use in the industry?).

*Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 378 (2d Cir. 2000).

There are disputed issues of fact relevant to these factors, including how unique the portable-profile idea was from other products on the market. Accordingly, summary judgment is unwarranted as to this part of Vogel's misappropriation claim (but just as with the DTSA claim, he can't proceed with respect to the dashboard feature).

## III.    Breach of contract and fiduciary duty claims

The parties devoted little attention to these claims. But the bottom line is that, at least with respect to the portable-profile feature, Vogel claims that Naji and El-Nahhas shut him out by working behind his back to create a separate company based on his idea despite their ongoing partnership agreement, which according to Vogel included an agreement to keep the partnership's ideas confidential. Whether an enforceable agreement was struck—and what it covered exactly—is for the jury to decide. But if the jury sides with Vogel, then he would potentially have a viable claim for Naji and El-Nahhas's breach of contract and of their fiduciary duties. So Vogel's claims premised on his alleged partnership and confidentiality agreement can go forward.

However, Vogel appears to be making an even broader argument that he, Naji, and El-Nahhas had an ongoing agreement to pursue any venture involving a payroll product in the entertainment space solely with each other. There's no support for that in the summary-judgment record.

The alleged partnership agreement between Vogel and defendants was undisputedly oral and terminated no later than January 16, 2018, when Vogel and Naji spoke on the phone and Naji

communicated that he didn't want to work together anymore. Although Vogel claims in his opposition brief that the jury could determine that the partnership was not terminable at will and was instead formed for a "particular undertaking," such that terminating it constituted a breach, there are no facts in the summary-judgment record that map onto this theory. As defendants point out, Vogel did not allege (and cannot now claim) that they had a contract to complete a prototype or build the company to a certain size. So there was no breach when Naji dissolved the partnership. *See Artco, Inc. v. Kiddie, Inc.*, 1993 WL 962596, at *8 n.2 (S.D.N.Y. 1993) ("New York law is clear that a venture at will can be terminated without liability for breach of contract by any partner at any time by any act which evidences intent to terminate the association."). After this date, no juror could find that defendants had a duty to continue working with Vogel on the project.

## IV.    Unjust enrichment and unfair competition

In the alternative, just as Vogel's misappropriation and contract-related claims may proceed (though not with the broad scope claimed by Vogel), he may proceed to trial on his unjust enrichment and unfair competition claims. To give an example, a jury may determine that despite the lack of an enforceable agreement governing the use of Tradekraft's portable-profile feature, Naji and El-Nahhas nevertheless misappropriated that idea and were unjustly enriched by it in developing Wrapbook.

## V.    Claims Against Cameron Woodward

Defendants argue that Vogel "has adduced not a shred of evidence linking Cameron Woodward, who joined Wrapbook *a year after it was founded*, to any of the allegations in this case." Dkt. 127 at 10 n.3. Vogel doesn't contest this point in his opposition brief, nor does he point to any evidence linking Woodward to any of the claims in this case. Accordingly, summary judgment is granted on Vogel's claims against Woodward.

## VI.    The Javed report

The Court agrees with defendants that Javed's opinions are inadmissible under Federal Rule of Evidence 702. *See* Dkt. 125.

Under that rule, expert witness testimony is permitted

if the proponent demonstrates . . . that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The district court plays the role of gatekeeper, determining whether the expert's testimony is reliable and relevant." *Faison-Williams v. United States*, 2025 WL 974831, at *3 (2d Cir. Apr. 1, 2025).

Javed claims to have calculated "benefit of the[] bargain" damages, actual losses in the form of "lost profits and other lost economic benefits from defendants' misappropriation of the trade

secrets," and unjust enrichment damages for trade-secret misappropriation. Dkt. 124-22 at 6. For all these measures, Javed reached one conclusion: Vogel is owed $46,653,263. Dkt. 124-24 at 8. He reached this conclusion by "perform[ing] a valuation of Wrapbook's equity for various classes of stock at various times, assuming [Vogel] would have been entitled to a full cofounder's share of that equity and to sell shares during funding events." Dkt. 125 at 13.

Defendants argue that Javed's report should be excluded because it is "not based on analyzing specific damages related to specific claims, but is instead 'a broad framework analysis,' which evaluates 'the economic benefits and financial rewards that flowed to [Vogel] by being a founder' of Wrapbook." *Id.* at 8. For the following reasons, the Court agrees that Javed's "damages opinions do not 'fit' the facts of the case" and so must be excluded. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 2022 WL 2757643, at *12 (S.D.N.Y. July 14, 2022).

### 1. Misappropriation damages

"The DTSA's broad compensatory damages provision allows a court to award: (1) 'damages for actual loss caused by the misappropriation;' and (2) 'damages for any unjust enrichment caused by the misappropriation . . . that is not addressed in computing damages for actual loss;' or (3) 'in lieu of damages measured by any other methods . . . a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.'" *Syntel*, 68 F.4th at 808–09 (quoting 18 U.S.C. § 1836(b)(3)). On his trade-secret misappropriation claim, Vogel seeks lost-profits and unjust-enrichment damages.

Javed's report fails to provide a reliable estimate of these measures. As an initial matter, Javed lumps together all the claims and alleged conduct alleged by Vogel in his complaint—including, for instance, his breach of contract, fiduciary duty, and trade-secret claims—as "Illegal Conduct" and then assumes that but for any of these violations, Vogel would have been able to participate equally with Naji, El-Nahhas, and Javid as cofounders of Wrapbook. Dkt. 124-22 ¶¶ 7–10, 37–38. His report doesn't further attempt to tie any specific claim to his damages opinions or distinguish among them, and he points to no case approving this approach to damages in a trade-secret case.

The report assumes that defendants misappropriated the following trade secrets: (1) "a portable profile system," (2) "the supply chain system dashboard," "and/or (3) the idea/information for a business or product that incorporates the portable profile system, supply chain system dashboard, and/or other Vogel Proprietary Information and Tradekraft Proprietary Information." Dkt. 124-22 ¶ 8(b)–(c). Of course, at this stage, Vogel is only asserting something resembling the first two: the portable profile and the all-in-on dashboard, the latter of which is not proceeding to trial.[3] So Javed's report appears to "include[] alleged damages for eliminated categories of trade secrets"

---

[3] Javed relied on Vogel's complaint in describing the alleged trade secrets, but the descriptions in Vogel's complaint are not the same as how Vogel now describes them. To give an example, as to the "portable profile," the complaint alleged that Vogel "designed a system" "using a novel, secure mechanism for user identification and access." At this stage in the case, Vogel doesn't claim to have designed an actual system using those features. *See* Dkts. 62 ¶ 30 (Second Amended Complaint); 124-22 ¶ 8(b) (relying on "a portable profile system, as described in paragraph 30 of the Second Amended Complaint").

without "apportion[ing] specific amounts to specific trade secrets." *Medidata Sols., Inc. v. Veeva Sys., Inc.*, 2021 WL 4243309, at *3 (S.D.N.Y. Aug. 25, 2021). "[T]his 'all or nothing approach' is plainly not helpful to the trier of fact." *Id.*

Vogel responds that apportionment is unnecessary because "the evidence shows that, but for their trade-secret misappropriation, Defendants would not have received *any* of the benefit of Mr. Vogel's proportionate share of Wrapbook and, indeed, there would be no Wrapbook." Dkt. 158 at 12. In other words, Vogel argues that "no matter how many of the secrets [defendants] misappropriated, [Vogel's] damages would be the same." *Ford Motor Co. v. Versata Software, Inc.*, 2018 WL 10733561, at *12 (E.D. Mich. July 9, 2018).

The Court disagrees. Even if the portable profile is a protectable trade secret, Wrapbook consists of much more than that feature. Javed's report makes no attempt to apportion out the value of that feature—or any other one—relative to the "non-trade secret elements" of the company, including its code, marketing, and business plans. S*ee id.* at *10. Javed said as much during his deposition when he admitted that that the asserted trade secrets were "component[s] of [Wrapbook's] necessary success," but "certainly there were likely other aspects of Wrapbook that were necessary for its success." *See* Dkt. 124-23 at 22:2–9. Nor does Javed account for any potential differences between Vogel and Wrapbook's actual cofounders, who worked to develop Wrapbook's product and had vesting and other restrictions tied to their equity. Javed also doesn't mention that the portable-profile idea was a *Tradekraft* asset, not Vogel's individually, and that Naji and El-Nahhas together owned the majority of Tradekraft. Dkt. 120-8 at 8:19–9:9, 177:4–10. So how does Vogel end up as an equal cofounder of Wrapbook with Naji and El-Nahhas? Javed doesn't say, because his analysis starts from the assumption that if Vogel prevails on any claim, he should be counted as a Wrapbook cofounder with equal rights. There's no stated basis to assume that the misappropriation of this alleged trade secret would automatically have entitled Vogel to cofounder status alongside Wrapbook's other founders.

Based on the lack of any evidence or reliable expert testimony, no juror could conclude based on this record that cofounder status is owed to Vogel solely based on the idea of a portable profile for the entertainment industry. *See Ford Motor Co.*, 2018 WL 10733561, at *12 (holding that expert had to apportion damages on a trade-secret-by-trade-secret basis because there was no "reliable support" for the conclusion that "each trade secret was 'independently necessary to achieve the benefit of the software' at issue").

Vogel argues that "courts take a flexible and imaginative approach to damages calculation in trade secret misappropriation cases." Dkt. 153 at 23 (quoting *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 809 (2d Cir. 2023). But there are limits. Javed's opinion fails to connect the dots between the trade secrets remaining in the case to his measure of damages—cofounder status in Wrapbook—and it doesn't apportion out the value of the purported trade secrets or ideas relative to each other or to the other, unprotectable features of Wrapbook. For these reasons, it fails scrutiny under Rule 702.

##### *2. Damages on the state-law claims*

Just like $46,653,263 is not a reliable calculation of Vogel's misappropriation damages, it is not a reliable calculation of damages flowing from Vogel's other claims. Once again, Javed's report doesn't attempt to tie any particular claim or underlying conduct to his calculations. Instead, as noted above, he simply assumes that Vogel should be treated as a cofounder of Wrapbook, and then analyzes what the present-day value of the equity he would have received would be.

And as to all these claims, neither Javed nor Vogel explains why his damages should be calculated by the value of Wrapbook's cofounder equity today, as opposed to in 2018. Take the contract claim for example. *See Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) ("It is fundamental proposition of contract law, including that of New York, that the loss caused by a breach is determined as of the time of breach."). Javed's damages estimate is based on Wrapbook's market value, but "the market value at the time of breach is the measure of damages." *Id.* Between then and now, Wrapbook's success was also the product of the skill of its managers and maybe some amount of luck. Its value calculated from its future trajectory bakes all of that in. But Javed doesn't account for any of it. Nor does Vogel point to any evidence from which a juror could conclude that "lost profit damages were within the contemplation of the parties when the contract was made," such that Vogel would be able to recover lost profits for the breach. *See Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).

Pointing to *Stavroulakis v. Pelakonos*, 2018 WL 846677 (N.Y. Sup. Ct. Feb. 13, 2018), Vogel argues that he should be able to put Javed's damages opinion to the jury because it constitutes a recognized method of quantifying unjust-enrichment damages for a fiduciary-duty breach. There, Stavroulakis, who originally owned 16.66% of Bareburger, sued defendants, who owned the rest of the company, after they "transferred all of the Company's assets to other entities in which defendants (but not plaintiff) ha[d] an interest[,] . . . rendering [Bareburger] an empty shell." *Id.* at *12. "Upon a finding of liability," the court explained, "the Shareholder Defendants [were] liable to disgorge all profits realized by virtue of their breach of fiduciary duty." *Id.* at *11 n.25. "While damages [were] not at issue," the court noted that it was "strongly inclined to award plaintiff a direct monetary recovery commensurate with his interest in the Company (e.g., his share of lost profits plus the present value of his share of the Company), rather than holding defendants personally liable to the Company for the full value of what [was] taken from the Company." *Id.* at *13–14.

Defendants' fiduciary breach, if any occurred, looked nothing like that in *Stavroulakis*, where defendants wholesale transferred all the company's assets "[u]nbeknowst to [the plaintiff] and without his consent." *Id.* at *2. There are few (if any) other variables in *Stavroulakis* that could have affected how much the plaintiff was owed. He previously owned some stock in a company and it was taken away from him. Giving that stock back to him (or its economic value) makes no assumption about *why* the value of the company was what it was. And exactly those kinds of speculative assumptions would be required here—assumptions that Javed's report doesn't help the Court or the jury to parse.

12

### 3. Where does that leave Vogel's damages case?

On the present motions, the parties don't address whether there is any other evidence in the record to support a request for damages from the jury on Vogel's claims or what that presentation might look like. Nor do they address whether, if Javed's testimony is excluded, Vogel should be given a chance to submit a revised report potentially addressing the concerns raised in defendants' motion and the Court's opinion. And at least some of Vogel's claims either don't require a showing of damages (Vogel's DTSA claim) or can proceed for nominal damages (e.g., breach of contract and fiduciary duty). Rather than concluding that no damages are viable and that some of Vogel's claims should be dismissed for failure to adduce evidence of damages, the Court will schedule a conference to address the next steps in this case and any further briefing that may be required to address these issues.

### 4. Vogel's motion to exclude defendants' damages experts is denied as moot.

In response to Javed's report, defendants submitted a rebuttal report from Greg Scheig and Stephen Buffo. The report is a critique of Javed's approach and analysis. Vogel moved to exclude only Buffo's opinion. But Buffo's opinion does nothing more than criticize Javed's testimony, which is now excluded. So Vogel's motion to exclude the testimony of Buffo is denied as moot.

## VII.    Vogel's motion for an adverse inference is denied.

Vogel seeks an adverse inference against defendants based on Naji's deletion of Tradekraft's private Slack channels in 2018. *See* Dkt. 128. Vogel says that he, Naji, and El-Nahhas used these private channels to communicate about topics related to Tradekraft that "go to core issues in this case." *Id.* at 2. In Vogel's view, an adverse inference is warranted because Naji deleted the channels eight days after their January 16 call, when Vogel "was contemplating potential claims . . . regarding the partnership and its work." *Id.* at 2.

Having reviewed the evidence submitted on the motion, no adverse inference is warranted. Vogel didn't suggest to Naji in 2018 that he was thinking about suing defendants. Indeed, on the January 2018 call Vogel and Naji seemed to reach an understanding that either of them could do whatever they wanted moving forward. Nor does the evidence indicate that Naji deleted the channels because he wanted to hide something from Vogel. Rather, it seems that it was a quick decision made when Naji realized, in closing up the Tradekraft workspace, that he couldn't back them up. *See* Dkt. 129-3. Finally, Vogel's description of what was on these channels is at a high level (even though he participated in the discussions and presumably knows what is on them), which doesn't give the Court much to go on. For instance, he says, pointing to the channels' labels, that "[c]ommunications on these topics go to core issues in this case—e.g., whether the partners' 'business plan' and user interface/experience was misappropriated by Wrapbook, and the parties' intent to form a partnership." Dkt. 128 at 2.

None of this supports a broad adverse inference that would, for all intents and purposes, win Vogel the case. However, Vogel may cross-examine Naji and El-Nahhas on this topic at trial,

given that the jury should have the full picture of what discussions that parties had during the time when Tradekraft was being pursued.

## CONCLUSION

For these reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion to exclude Javed's testimony is GRANTED. Vogel's motion to exclude the testimony of defendants' rebuttal damages experts is DENIED as moot. Vogel's motion for an adverse inference is DENIED.

Lead counsel should meet and confer on three available dates during the month of October for a hearing to address any outstanding issues arising from this order. Clients are required to attend. If the parties mutually agree, the Court is willing to assist the parties in a settlement discussion at this hearing (if there is no mutual agreement, the parties should not inform the Court who isn't interested). That discussion would involve *ex parte*, off-the-record discussions with each side.

The Clerk of Court is directed to terminate Dkts. 114, 115, 116, and 128.

SO ORDERED.

Dated: September 25, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge

14